**SOUTHERN NATIONAL BANK OF HOUSTON, Appellant,**

v.

**Clayton E. BLAKEWAY et al., Appellees.**

**No. 622.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

Aug. 2, 1972.

Rehearing Denied Sept. 13, 1972.

George H. Hagle, Bass C. Wallace, Hall E. Timanus, Andrews, Kurth, Campbell & Jones, Houston, for appellant.

Warner F. Brock, Brock & Williams, Houston, for appellees.

TUNKS, Chief Justice.

In August of 1964 Clayton Blakeway, William B. Ward and Wilbur Clarke formed a Texas limited partnership, Austin Crest Venture, Ltd., to build the Crest Hotel in Austin. The site, overlooking Town Lake, was sold by Blakeway to the limited partnership.

The cost of such venture was estimated to be 3.3 million dollars. Of this amount, six Austin banks and savings and loan associations and a San Antonio Savings and Loan Association (hereafter referred to as the Austin group) executed their commitment to the partnership in the sum of 2.7 million dollars. Quality Industries, known as Tri-Financial Corporation, committed itself to the remaining $600,000.00. The interim financing was through Southern National Bank on a preclosed loan basis.

Austin Crest Venture, Ltd. leased the land and hotel, when completed, to W. C.

Austin, Inc., a corporation, the stock of which was owned 50% by Clarke and 50% by Ward. W. C. Austin, Inc. entered into a management contract for the hotel with Wilbur Clarke Crest Hotel, Inc., a management company owned by Wilbur Clarke Inns of America, Inc.

During construction of the hotel Wilbur Clarke died. His estate thereafter refused to release any money for this venture and the administrators began the winding up of his estate. William B. Ward, the other of the three partners, left the country shortly after the opening of the hotel and at the time of trial had not been heard from since. Clayton Blakeway was left to run the hotel.

Initially, the closing of the permanent financing was to be on February 4, 1966, when the interim lender, Southern National Bank, was to be paid off by the permanent lenders, the Austin group and Quality. The Austin group sought a one-year extension of the closing date so as to keep their loan ratios in balance. A 90 day extension agreement was reached between Southern and the Austin group, but no such agreement was made with Quality. On February 4, 1966, Southern tendered the $600,000.00 note to Quality, but Quality did not buy it. The nature of the controversy that resulted from Quality's failure to take its portion of the permanent financing is not clear from this record. That controversy seems to be the subject of another lawsuit.

During the 90 day extension period Clayton Blakeway continued to operate and manage the hotel, investing his money into the operation. He sought to sell the hotel or find a hotel chain to take over the operation of it. The title to the property, being held by a limited partnership of which one partner had disappeared and another had died, coupled with the rumor that another person had bought or was to buy all of Ward's and/or Clarke's interest, was somewhat clouded.

On May 2, 1966, the end of the 90 day extension period, Southern met with the Austin group and Blakeway. Upon Blakeway's payment of approximately $110,000.-00 to bring current the 2.7 million dollar note, the Austin group purchased that note from Southern. Southern subordinated its lien securing the remaining $600,000.00 note to that securing the 2.7 million dollar note. In order for Blakeway to make the $110,000.00 payment he had to borrow $80,000.00 from Southern. Such loan was represented by Blakeway's note to Southern which will be discussed hereinafter.

Although Southern did not agree with Quality to extend the date for its assumption of the permanent financing of the $600,000.00 note, no action was taken by Southern for the foreclosure of the lien securing that note until May 16, 1966. The note was then in default and on that date Southern posted for foreclosure the second lien upon the hotel securing it. By such posting the foreclosure was set for June 7, 1966.

After Southern posted notice of its foreclosure of its second lien the Austin group, holders of the first lien, evidenced some concern over such action and indicated that they were considering declaring their note in default and foreclosing their first lien. They did, in fact, accelerate their note. As a result, on May 31, 1966, Southern, the Austin group and Blakeway met and conferred as to the situation. It was at this meeting that Southern allegedly made the oral agreement upon which Blakeway's case is based. Although the evidence is contradictory on the subject, the jury found on sufficient evidence that such agreement was made.

The nature of the agreement made at the May 31 meeting must be considered in the light of the status of the title to the hotel property. As noted above, the ownership was such that it would be difficult, if not impossible, to procure an acceptable deed from the record title holder. All parties, therefore, agreed that, for the purpose of making available a marketable title, Southern should proceed with its foreclosure so

that it could then furnish an acceptable deed to the property.

Thus, the first agreement made at the May 31 meeting was that Southern should foreclose as planned. Next, Southern agreed that it would bid in the property on foreclosure sale for $600,000.00, the amount of the second lien note. (The buyer would, of course, take subject to the Austin group's first lien.) This would prevent Blakeway's liability for a deficiency.

Finally, at the May 31 meeting it was agreed that after the foreclosure Blakeway would continue to operate the hotel for a period of six to eight months—that he would "see that the doors of the hotel stayed open" for such period. It was recognized by all parties that it would be easier to find a buyer or financier for an operating hotel than for a closed one and that all would thus benefit from such continued operation. In connection with the agreement that Blakeway keep the hotel in operation, Southern agreed that Blakeway should have during such period the right to produce a buyer or lessee of the property or to refinance it, and that he should have the profit, if any, that would result from such sale, lease or refinancing.

As has been noted, Southern denied having made the oral agreements of May 31 as alleged by Blakeway, but the jury found on sufficient evidence that it did. There was also evidence which was sufficient to have sustained a verdict to the contrary. It was uncontroverted, however, that Southern did not perform in accordance with the terms of the alleged agreements. On June 7, at the foreclosure, Southern bid in the hotel for $315,000.00. Thereupon Southern took possession of the hotel from Blakeway. Soon thereafter Southern's representatives organized a new corporation, Austin Crest Hotel, Inc., and Southern's interest in the hotel was formally sold to it for $400,000.00 represented by the corporation's promissory notes of $315,000.00 and $85,000.00. The Austin group had insisted upon its right to approve any new owner to whom Southern's interest in the hotel might be sold. The Austin group approved Lumberman's Investment Corporation as such an entity to which Southern could sell. Upon such approval the hotel was sold to that corporation for $400,000.00. Lumberman's Investment Corporation paid $100,000.00 on the first lien note, making it current, and the Austin group withdrew their acceleration of the note.

Suit was brought in Travis County by Blakeway and his wife against Southern National bank and the Austin group. Upon the granting of Southern's plea of privilege the claims relating to Southern were severed and transferred to Harris County. Southern filed counter-claims upon the $80,000.00 note and for the deficiency suffered on the $600,000.00 note.

The jury, upon special issues submitted, found that an oral agreement, as that alleged above, was reached between the parties and that Blakeway suffered a loss of $1,356,886.03 as a result of Southern's breach of that agreement. They further found that Southern made those representations, as alleged above, that all such representations were false, that Blakeway relied upon the truth of such false representations and that such representations were material inducements to continue at his own expense the operation of the hotel, to execute the $80,000.00 note, and to search for a purchaser. The damages sustained by Blakeway as a result of such reliance were found to have been $1,356,886.03.

The trial court, in a final corrected judgment and upon plaintiffs' remittitur, adjudged that Blakeway recover from Southern $760,583.21 (which includes prejudgment interest) and that Southern recover nothing on its counter-claims.

Appeal is made upon eleven points of error. The first point contends error in overruling defendant's motion for instructed verdict and for submitting issues on contract or agreement since there is no proof of compliance with the statute of frauds. The next points assert that the

trial court erred in submitting various issues to the jury and that the jury's answers were with no factual basis in the evidence or were against the great weight and preponderance of the evidence (points 2, 3, 4, 5, 7, 8 and 9). By points 6, 10 and 11 appellant asserts that the trial court erred in failing to instruct the jury in accordance with defendant's requested instruction on damages, in allowing plaintiffs' counsel to write "agreement" on the blackboard and display same before the jury, and in disallowing recovery on Southern's counter-claims.

We are met at the outset with American Nat. Ins. Co. v. Warnock, 131 Tex. 457, 114 S.W.2d 1161 (1938), a case which we feel controls this case. The facts are quite similar. In that case the Stockton Building Association, a corporation which owned the Rooney Hotel in Ft. Stockton, Texas, borrowed $25,000.00 from American National Insurance Company, defendant, giving a deed of trust on the hotel as security. The note being delinquent, on November 28, 1932, W. O. Watson, Assistant Treasurer of the insurance company and purporting to act for it, wrote to S. C. Johnson, who had been a stockholder in Stockton Building Association and in active control but had sold his stock to Warnock, and in the letter suggested a foreclosure and resale of the hotel. Johnson, after getting approval from Warnock, obtained an oral agreement from Watson that after foreclosure the company would resell to Johnson or his nominee. A letter by Johnson was written to Watson to this effect and Warnock made three monthly payments to the insurance company of $75.00 each toward the hotel's $25,000.00 indebtedness. These payments were discontinued when Watson stated that there was no such agreement and put the hotel in receivership.

About a year later Johnson sued some parties for rent due on other property upon which the defendant insurance company had a deed of trust. The insurance company was made a party defendant to this suit for rent. During this time, the insurance company was advertising the hotel for sale under its deed of trust. Warnock allegedly extracted another oral promise from the insurance company for resale of the hotel to Warnock in consideration of Johnson dismissing his suit against it. This too was later denied and the hotel was purchased by the insurance company and sold to a third party. Suit was brought by Warnock against the insurance company for damages. The defenses raised included the statute of frauds. The trial court rendered judgment for the plaintiff, Warnock.

The Court of Civil Appeals, considering both agreements as one, determined that it would be perpetrating a fraud to allow the seller insurance company to set up the statute of frauds. Based primarily on Matthewson v. Fluhman, 41 S.W.2d 204 (Tex. Com.App.1931, judgment adopted) and Morris v. Gaines, 82 Tex. 255, 17 S.W. 538 (1891), the Court of Civil Appeals affirmed Warnock's judgment for damages against the insurance company, holding that the defendant was estopped to raise the statute of frauds defense.

On appeal the Supreme Court reversed, asserting that removal of a parol sale of land from the operation of the statute of frauds, under Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114 (1921) requires the showing of:

"1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. Payment of the consideration, though it be a payment in full, is not sufficient. This has been the law since Garner v. Stubblefield, 5 Tex. 552. Nor is possession of the premises by the vendee. Ann Berta Lodge No. [42, I.O.O.F. v. Leverton], 42 Tex. 18.

Each of these three elements is indispensable, and they must all exist."

The Court held that the insurance company properly invoked the statute of frauds against the enforcement of the two contracts alleged by Warnock. For such reason, enforcement of such agreements was prohibited.

■ The fact situation in the present case is akin to the facts presented in the first agreement reached between Johnson, Warnock and the insurance company—a promise by the insurance company after purchase at the foreclosure sale to resell to Johnson or his nominee, Warnock. Southern, who would become the owner upon the expected June 7 foreclosure, "promised" in effect a resale to Blakeway or his nominee with allowance to Blakeway of any resulting profits. This constitutes a conveyance in violation of the statute of frauds, Tex. Bus. & Comm.Code Ann. sec. 26.01(b)(4) (1967), V.T.C.A.

Appellees argue that, upon their performance of the requested consideration by keeping the hotel in operation at their own expense, either Southern is estopped to raise the statute of frauds or equity, under the circumstances, relieves this case from its operation. The real consideration for such future conveyance would have been payment of the indebtedness by Blakeway or his nominee.

■■ For equity to estop one from asserting the defense of the statute of frauds or to relieve an agreement from its operation, acts of the party relying upon such promise must manifest the actual existence of such an agreement. The acts done must point to a specific agreement. In the present case the acts of Blakeway in keeping the hotel open at his expense do not necessarily point to such an agreement. The evidence shows that the maintaining and keeping open of the hotel were just as beneficial to Blakeway as to Southern and the Austin group. Any closing would have greatly diminished Blakeway's chances of selling the property, either before or after foreclosure, and would have sharply reduced its value. Besides, the manifestations required in an enforceable oral agreement to convey land are clearly set out in Hooks v. Bridgewater and American Nat. Ins. Co. v. Warnock, supra.

The fact that Blakeway was in a position similar to that of Johnson in the Warnock case and not a "nominee" as was Warnock does not affect the outcome. Neither the promisee nor his nominee could enforce the agreement or recover damages for the alleged breach of contract without the showing of compliance with the Hooks case. The statute of frauds prohibits enforcement of such agreements unless evidenced by a written memorandum, and the facts presented here failed to show sufficient grounds for the intervention of equity. Appellant's first point of error is sustained.

■ As to appellant's last point concerning its counter-claims, this shall be sustained in part and overruled in part. The jury found that as part of the general agreement reached on May 31, 1966, Southern would not take less than 100 cents on the dollar for the $600,000.00 note at the June 7 foreclosure sale. The evidence presented on this matter is sufficient to sustain this finding. This is in effect an agreement to release Blakeway from liability for any deficiency judgment and as such is not a contract for the sale of land. Thus, compliance with the statute of frauds is not required and there need be no written memorandum. Lobit v. Marcoulides, 225 S.W. 757 (Tex.Civ.App., Galveston 1920, writ ref'd). The trial court's disallowing Southern any recovery on this deficiency was proper.

■ As to the point of the $74,820.74 balance due on the $80,000.00 note, there is error and the point is sustained. Appellant has attacked special issues nos. 9, 10 and 11 as having no basis in the evidence. There is no showing by Blakeway that any representation caused him to execute the

$80,000.00 note. His cause is based upon an alleged oral agreement reached on May 31, 1966, and this $80,000.00 note was executed on May 2, 1966, to bring current the 2.7 million dollar note. No agreement can be pointed to upon which reliance can be based. Plaintiff has shown no valid defense to this counter-claim and the judgment should be corrected to allow Southern recovery of the balance due on the $80,000.00 note.

All other points are overruled. The judgment of the trial court is in part affirmed and is in part reversed and rendered as herein set forth.